WILLIAM H. STEELE, UNITED STATES DISTRICT JUDGE
This matter comes before the Court on a host of intertwined, overlapping and often repetitive motions, to-wit: defendants' Motion for Dismissal and/or for Summary Judgment on Certain Class Claims (doc. 136), Motion for Summary Judgment on Claims of Breonna Franks (doc. 139), Motion for Summary Judgment on Claims of Tara Taylor (doc. 140), Motion for Summary Judgment on Claims of Diane Bowden (doc. 141), Motion for Summary Judgment on Claims of Carrie Bowens (doc. 142), Motion to Strike "Expert Opinions" (doc. 157), and Motion to Strike Select Portions of Plaintiffs' Opposition (doc. 158).[1] The parties have been afforded a full opportunity to be heard on each of these Motions. In the interests of efficiency and judicial economy, all such Motions are adjudicated via this omnibus Order.
I. Nature of the Case.
This matter consists of multiple consolidated putative class action complaints purporting to assert claims for damages and equitable remedies arising from plaintiffs'
*1190 use of a hair coloring product, Clairol Balsam Color (the "Product"). The four named plaintiffs whose claims are presently in play are Breonna Franks, Tara Taylor, Diane Bowden, and Carrie Bowens, all of whom are represented by the same or substantially the same counsel. Each plaintiff alleges that she sustained physical injuries (such as itching and burning of the scalp, hair loss and hair damage) arising from her use of the Product. On that basis, each plaintiff asserts substantially similar claims, including causes of action for unjust enrichment, violation of the Magnuson-Moss Warranty Act, breach of express warranty, breach of implied warranty, fraud, and negligent design/failure to warn. Certain plaintiffs also bring claims for violation of the Alabama Deceptive Trade Practices Act. Named defendants include Coty Inc., The Procter & Gamble Company, The Procter & Gamble Manufacturing Company, Inc., The Proctor & Gamble Distributing, L.L.C. and Procter & Gamble Hair Care, L.L.C., each of which is alleged to have had some role in developing, designing, manufacturing, packaging, labeling, distributing and/or selling the Product.
II. Background Facts.[2]
A. The Product and its Packaging.
The packaging of the Clairol Balsam Color hair dye product that plaintiffs used is significant to the claims and defenses presented here. The box in which the Product was distributed and marketed for retail sale contained various instructions, warnings and disclosures, including the following: (i) on the box top, a warning stating "CAN CAUSE ALLERGIC REACTIONS FOLLOW THE SAFETY WARNINGS;" (ii) on the top flap of the box, an instruction to "FOLLOW SAFETY WARNINGS, PERFORM THE SKIN ALLERGY TEST 48 HOURS BEFORE COLORING;" (iii) on the side of the box, under the heading "IMPORTANT SAFETY WARNINGS," statements that "HAIR CARE PRODUCTS MAY CAUSE ALLERGIC REACTIONS, WHICH IN RARE CASES CAN BE SEVERE," that "TATTOOS MAY INCREASE THE RISK OF ALLERGY TO THIS PRODUCT," and that the user should "CONDUCT A SKIN ALLERGY TEST 48 HOURS PRIOR TO EACH APPLICATION, EVEN IF YOU HAVE ALREADY USED COLORING PRODUCTS BEFORE," as well as an instruction "DO NOT USE THIS PRODUCT IF YOU HAVE EXPERIENCED ANY REACTION TO HAIR COLOR PRODUCTS OR HAVE SENSITIVE, IRRITATED OR DAMAGED SCALP;" (iv) on the side of the box, a directive to "READ AND FOLLOW INSTRUCTIONS CAREFULLY;" and (v) on the side of the box, a *1191 statement reading "CAUTION: THIS PRODUCT CONTAINS INGREDIENTS THAT MAY CAUSE SKIN IRRITATION ON CERTAIN INDIVIDUALS AND A PRELIMINARY TEST ACCORDING TO ACCOMPANYING DIRECTIONS SHOULD FIRST BE MADE." (Doc. 137, Exh. B.)[3] The outside of the box also contained a section with the heading "Questions?" along with a telephone number, website, and mailing address for "the Expert Color Consultants." (Id. )
Inside the box, the consumer would find a bottle of Developing Lotion, a bottle of Permanent Color, a pair of disposable gloves, and a leaflet. (Doc. 137, Exh. C, D, E.) The leaflet enumerated the steps for application and use of the Product in "an easy coloring experience." More importantly, for purposes of this litigation, the leaflet contained safety information and instructions as to the proper use of the Product. Under the heading "IMPORTANT: SAFETY INSTRUCTIONS," the leaflet repeated the warnings from the box that hair colorants can cause allergic reactions, which may be severe; that tattoos may increase the risk of allergy to the Product; that the consumer should not use the Product if she had experienced any reaction to hair color products or had a sensitive scalp; and that a skin allergy test must be conducted 48 hours prior to each application. (Doc. 137, Exh. C.) The leaflet also contained detailed "SKIN ALLERGY TEST INSTRUCTIONS," which involved placing a small amount of Product in the bend of one's elbow and leaving it there for 48 hours to see if any adverse reaction occurs, along with a directive that "IF A RASH, REDNESS, BURNING OR ITCHING DOES OCCUR YOU MAY BE ALLERGIC. STOP. YOU MUST NOT USE THIS PRODUCT." (Id. ) Elsewhere, the leaflet directed consumers to "rinse immediately and discontinue use" in case of any stinging, burning or rash during the coloring process; instructed them "DO NOT color your hair again before consulting a doctor;" and advised them to "SEEK IMMEDIATE MEDICAL ATTENTION" in the event of rapidly spreading skin rash, swelling to the eyes or face, blistering, and/or skin or scalp weeping. (Id. )
The bottle of Permanent Color also contained a prominent warning on the label. That warning stated as follows: "CAUTION: THIS PRODUCT CONTAINS INGREDIENTS WHICH MAY CAUSE SKIN IRRITATION ON CERTAIN INDIVIDUALS AND A PRELIMINARY TEST ACCORDING TO ACCOMPANYING DIRECTIONS SHOULD FIRST BE MADE." (Doc. 137, Exh. E.)
B. Plaintiff-Specific Facts Regarding Product Use and Injuries.
Plaintiff Breonna Franks first used the Product in 2013, when a high-school classmate told her about it. (Franks Dep. (doc. 139, Exh. A), at 52-54.) Franks testified that she read the "Important Safety Warnings" portion of the box before purchasing the Product at a Walmart in Mississippi. (Id. at 58-59.) Franks did not attempt to perform the skin allergy test because she "didn't know how to do it;" however, Franks failed to make any telephone calls to defendants or anyone else to inquire about it or otherwise to seek help. (Id. at 57-60.) The first time Franks used the Product, "it just started burning real bad, *1192 the back of my head," so she washed it out because she "couldn't wait no longer." (Id. at 60.) Two weeks later, Franks noticed that her hair was falling out when she combed it or ran her hands through it. (Id. at 60-61.) Despite this adverse reaction, Franks continued to use the Product every four to six weeks when "the color was leaving out of" her hair. (Id. at 42-43.) Each time she used the Product, Franks experienced itching and burning of her skin, and her hair falling out. (Id. at 43-44.) Nonetheless, she continued to apply the Product and did not consult a doctor. (Id. at 44.) Franks never attempted to perform the skin allergy test described on the box and leaflet. (Id. at 56.) She has never received medical treatment for alleged injuries sustained through her use of the Product. (Doc. 139, Exh. G.) And she has received treatment for alopecia (hair loss) from a dermatologist dating back as far as 2012, with her treating physician opining in 2015 that her alopecia was the result of braiding her hair too tightly. (Franks Dep., at 25-37.)
Plaintiff Tara Taylor has been using hair coloring products twice per year for more than 20 years, but was originally using a non-Clairol product that never gave her problems or caused reactions. (Taylor Dep. (doc. 140, Exh. A), at 9-11.) At some indeterminate point, she switched to using the Product. (Id. ) Taylor had a reaction to an unknown hair coloring product approximately three years ago, when she experienced swelling in her lymph nodes for two days. (Id. at 11-12.) When using hair coloring products, Taylor always tests them by placing some of the product on her wrist for an hour to see if anything happens; however, those tests never yielded any positive indication of allergic reaction. (Id. at 13-15.) Taylor purchased the Product from a Family Dollar store in Louisiana on or about October 18, 2016. (Id. at 34-36.) Taylor had used the Product before, and had previously read the warnings and instructions on the box. (Id. at 24, 26.) She has tattoos, and was aware of the warning on the box that tattoos could increase the risk of allergy from use of the Product. (Id. at 27.) Taylor applied the Product on October 19, 2016, after performing a skin test as previously described. (Id. at 37.) The following day, Taylor's head began itching and she developed blisters and weeping sores. (Id. at 38.) On the morning of October 21, 2016, Taylor awakened to discover that one side of her face was swollen. (Id. at 39.) By the time she reached the emergency room that day, her condition had worsened to the point where her eyes were swollen shut. (Id. ) On October 22, 2016, Taylor returned to the emergency room for treatment of the painful swelling on her face. (Id. at 44.) During these visits, Taylor was diagnosed with contact dermatitis and tinea capitis, which is ringworm of the scalp. (Richardson Dep. (doc. 140, Exh. G), at 13, 22-23.) She was prescribed medications, and within a week and a half the swelling had subsided. (Taylor Dep., at 53.) However, approximately two days after her second emergency room visit, Taylor lost all her hair. (Id. at 60.) It has grown back, but not completely, so Taylor wears wigs to cover the lingering areas of baldness. (Id. ) Taylor's treating physician has no opinion as to whether the hair dye (as opposed to the tinea capitis ) caused her hair loss, or what specific ingredients or components actually triggered her reaction. (Richardson Dep., at 25-27.)
Plaintiff Diane Bowden used hair coloring products for approximately 20 years, coloring her hair whenever she "saw the gray." (Bowden Dep. (doc. 141, Exh. A), at 20-21.) She used different brands and different products during that period. (Id. at 21.) On two occasions prior to January 2016, Bowden experienced an itching sensation on her head after applying a hair coloring product. (Id. at 26-27.) In January 2016, Bowden (an Alabama resident) used the Product for the first and only time. ( *1193 Id. at 18.) When she purchased the product, Bowden did not read any writing on the box other than the color. (Id. at 31, 48.) She did not review the leaflet inside the box before using the Product, although she had "looked at them in the past" with respect to other hair coloring products. (Id. at 34, 48.) Bowden did not perform a skin allergy test before applying the Product to her head. (Id. at 35.) While the Product was still in her hair, Bowden's head started burning, so she rinsed it out with water. (Id. at 42-43.) She "can't remember" whether rinsing out the Product from her hair caused the burning sensation to stop. (Id. at 44.) She experienced no other immediate physical manifestations of a reaction to the Product. (Id. ) According to Bowden, "shortly after this" (perhaps one or two weeks later), her hair "started falling out." (Id. at 45-46.) Bowden's hair "still sheds" today whenever she combs. (Id. at 46.) She has never sought medical treatment for any issues relating to her use of the Product. (Id. at 45-46.)
Finally, plaintiff Carrie Bowens has been using hair coloring products dating back to the late 1970s. (Bowens Dep. (doc. 142, Exh. A), at 22.) At no time prior to 2016 did Bowens ever have any adverse reaction to a hair color product. (Id. at 29-30.) The first time Bowens ever used the Product was in January or February 2016. (Id. at 20.) Before purchasing the Product at a Walmart in Alabama, Bowens read the safety warnings, instructions, and ingredients printed on the box. (Id. at 42.) She also read the warnings on the bottle before using the Product. (Id. at 73.) Prior to applying the Product, Bowens did a patch test by placing a small quantity of the Product near the bend of her arm for one and a half days. (Id. at 48.) When she experienced no symptoms of a reaction, Bowens colored her hair the following day. (Id. at 49.) She felt an itching and burning sensation on her head after applying the Product, so she washed it out 15 minutes later. (Id. at 53-55.) At that time, Bowens was unaware of whether the Product was the cause of the reaction, so she used the Product again a couple of months later. (Id. at 51, 53-55, 61.) Once again, within 15 minutes, Bowens experienced itching and burning, so she washed the Product out of her hair. (Id. at 63-64.) According to Bowens, she still experiences itching (but not burning) on her head today. (Id. at 64-65.) Upon each of these two applications of the Product, Bowens experienced temporary hair thinning; however, it has grown back. (Id. at 54, 66.) Bowens has not colored her hair again with anything other than a hair rinse following her second use of the Product. (Id. at 67-68.) She received no medical treatment for any injuries arising from her use of the Product. (Id. at 65.)
III. Summary Judgment Standard.
Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc. , 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. Id. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." Id. (quoting Celotex Corp. v. Catrett , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of *1194 the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen , 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." Offshore Aviation v. Transcon Lines, Inc. , 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).
IV. Motions to Strike.
Antecedent to reaching the merits of the numerous pending Motions for Summary Judgment, the Court considers a pair of Motions to Strike filed by defendants during the course of the summary judgment briefing process.
A. Motion to Strike Expert Opinions.
Among their filings in opposition to defendants' myriad Motions for Summary Judgment, plaintiffs submitted a 12-page document styled "Expert Report: Clairol Randall I. Tackett, PHD" (doc. 156, Exh. B) and a six-page document that purports to be the "expert review and report" of Ernest N. Charlesworth, MD (doc. 156, Exh. C.) In response, defendants filed an Objection and Motion to Strike (doc. 157), in which they argue that the Tackett and Charlesworth exhibits must be stricken because (i) "[n]either of these documents is sworn and neither is in the form of an affidavit;" and (ii) "neither is made under penalty of perjury and neither comports with the requirements for submission of a declaration." (Doc. 157, ¶ 3.) Review of those exhibits confirms that defendants' characterization is accurate. They are unsworn documents that bear the identifying characteristics of neither affidavits nor declarations.
Nonetheless, defendants' argument overlooks the well-established proposition that material may properly be considered on summary judgment so long as it is capable of being reduced to admissible form. See, e.g. , Rule 56(c)(2), Fed.R.Civ.P. ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Brannon v. Finkelstein , 754 F.3d 1269, 1277 n.2 (11th Cir. 2014) (hearsay statement "should be considered on summary judgment here because it can be reduced to an admissible form at trial"). District courts in this Circuit, including the undersigned, have applied this principle to expert opinions.[4] All indications are that the opinions of experts Tackett and Charlesworth set forth in their unsworn reports can be reduced to admissible form at trial; indeed, defendants do not suggest otherwise. Accordingly, the contents of those reports are properly considered for summary judgment purposes, notwithstanding their unsworn status.[5] Defendants'
*1195 Objection to Exhibits B and C is overruled , and their Motion to Strike "Expert Opinions" (doc. 157) is denied .
B. Motion to Strike Portions of Plaintiffs' Briefs.
In their second Objection and Motion to Strike, defendants take aim at three aspects of plaintiffs' responses to the Motions for Summary Judgment. First, defendants contend that "[i]n the various filings, Plaintiffs, in wholesale fashion, fail to cite to the record" to support certain purportedly factual statements that are not contained in the record at all. (Doc. 158, at 2.) Second, defendants object to what they call "opinions, allegations, and conclusory statements and ... arguments of counsel" contained in portions of plaintiffs' summary judgment filings. (Id. at 8.) Third, defendants assert various objections to what they characterize as "unverified expert reports and unauthenticated citations to literature." (Id. at 13.) Each of these strands of argument shall be addressed in turn.
As an initial matter, defendants object and seek to strike portions of plaintiffs' summary judgment briefs that purport to make factual statements without accompanying record citations. Defendants are correct that a litigant on summary judgment must provide pinpoint citations to the record to support statements of fact. See Civil L.R. 56(b) ("The non-movant's brief must include ... all facts relied upon, each supported by a specific, pinpoint citation to the record."); Rule 56(c)(1)(A), Fed.R.Civ.P. ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record."). On summary judgment review, a court cannot simply accept counsel's ipse dixit for an unsupported factual statement in a brief. See, e.g., Ely v. Mobile Housing Bd. , 13 F.Supp.3d 1216, 1218 n.1 (S.D. Ala. 2014) ("This Court cannot and will not simply take counsel's word for it that particular unsupported facts are correct."); Kirksey v. Schindler Elevator Corp. , 2016 WL 3189242, *8 n.17 (S.D. Ala. June 7, 2016) ("Of course, a court on summary judgment cannot accept counsel's ipse dixit for a particular fact."). Examination of plaintiffs' briefs reveals that they do contain certain statements of fact unaccompanied by record citations, and as to which supporting materials in the record appear to be lacking. Defendants' objection to these statements is well-taken.
*1196 A decidedly different question is whether defendants' Motion to Strike these unsupported factual statements from plaintiffs' briefs should be granted. Such a process would be laborious and time-consuming, essentially requiring the Court to go line-by-line through plaintiffs' multiple summary judgment briefs striking facts that are missing record citations or record support. Moreover, the act of striking those statements would accomplish nothing. After all, "[m]otions to strike are generally disfavored as time wasters that distract the court from the merits of a party's claim." Zukowski v. Foss Maritime Co. , 2013 WL 1966001, *3 (S.D. Ala. May 10, 2013) (citations omitted); see also Morgan v. Bill Vann Co. , 2013 WL 4657554, *1 n.1 (S.D. Ala. Aug. 30, 2013) ("motions to strike should not be filed in federal court[ ] as a kneejerk reaction whenever a litigant is unhappy with either the contents of an exhibit or the other side's arguments"); Essex Ins. Co. v. Foley , 827 F.Supp.2d 1326, 1327 n.1 (S.D. Ala. 2011) (opining that it is both disfavored and generally inappropriate to strike arguments or other portions of filings merely because they lack merit or "may suffer from a logical or factual defect"). To the extent that plaintiffs have asserted facts in their briefs without factual support or citation to the record, the appropriate course of action is to disregard those statements. Striking them from the briefs would advance no constructive purpose. See generally Kirksey , 2016 WL 3189242, at *3 n.6 ("the Court will not strike Exhibit T from the summary judgment record" where "Movants provide no explanation for why the draconian step of striking this exhibit (rather than simply exercising judicial discretion not to consider it) is an appropriate remedy here"). Accordingly, the Motion to Strike (doc. 158) is denied as to unsupported factual statements in plaintiffs' briefs; provided, however, that the Court will not consider any such statements in adjudicating the Rule 56 motions.
Next, defendants lodge objections to, and seek to strike, portions of plaintiffs' summary judgment briefs in which counsel offer self-serving opinions and conclusory statements. According to defendants, in many places in their briefs, plaintiffs' counsel engage in "improper argument" that they do not even "attempt to pass as facts." (Doc. 158, at 13.)[6] This objection is quite similar to the "unsupported fact" objection addressed supra. Plaintiffs' counsel cannot create genuine issues of material fact by making speculative, conclusory, unsupported statements in their summary judgment briefs. Once again, however, striking sections of those briefs as improper argument would be inefficient, unhelpful and accomplish nothing. So while defendants' objection is well-taken as to at least certain passages in plaintiffs' summary judgment briefs, the Motion to Strike is denied as to plaintiffs' counsel's "improper opinions, allegations, and conclusory statements." (Doc. 158, at 8.) Where the Court encounters such statements in plaintiffs' briefs, it will not consider them in adjudicating the summary judgment motions. No further relief is necessary to protect defendants from any improper argument by plaintiffs' counsel.
Finally, defendants' Motion to Strike sets forth objections to plaintiffs' expert reports of Randall Tackett and Ernest Charlesworth, which defendants characterize as "unverified expert reports" with "unauthenticated citations to literature." (Doc. 158, at 13.) Insofar as defendants *1197 complain that the Tackett and Charlesworth reports are unsworn, this argument is redundant of that previously presented and rejected in the context of defendants' other Motion to Strike (doc. 157). The Court declines to re-plow that ground here. To the extent that defendants object that literature cited in the Tackett and Charlesworth reports has not been authenticated and is hearsay, defendants' Motion to Strike is deficient because it fails to take into account Rule 703 of the Federal Rules of Evidence. On its face, that rule allows experts to base opinions on facts or data of which the expert is aware and provides that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Rule 703, Fed.R.Evid. Moreover, the rule provides that if the facts or data would otherwise be inadmissible, the expert may still disclose them to the jury if their probative value outweighs their prejudicial effect. These features of Rule 703 would appear to negate defendants' objections to plaintiffs' expert reports' citations to materials like the Personal Care Products Council's Consumer Commitment Code, FDA regulations, and the "Practice Parameters" on contact dermatitis promulgated by the Joint Task Force on Practice Parameters. Defendants have advanced no persuasive argument that the "basis evidence" provision of Rule 703 would not allow these aspects of plaintiffs' expert reports to be reduced to admissible form at trial, and therefore to be properly considered on summary judgment. See, e.g., Kirksey , 2016 WL 3189242, at *5 ("If the contents of those articles can be presented in admissible form via expert testimony through the 'basis evidence' mechanism of Rule 703, however, then the admissibility vel non of the underlying articles is of no consequence.... [T]here is no indication ... that the pertinent aspects of Exhibits F, G and NN cited in Kirksey's summary judgment filings cannot be reduced to admissible form at trial via Rule 703."). Accordingly, defendants' Objection to plaintiffs' expert reports is overruled, and the Motion to Strike is denied as it relates to the objected-to portions of those reports.
V. Analysis of Issues Concerning Plaintiffs' Class Claims.
Before reaching issues and arguments focused on particular plaintiffs, the Court examines defendants' "Motion for Summary Judgment on Certain Class Claims" (doc. 136). Through this Motion, defendants take aim at the viability of certain classwide claims, including all plaintiffs' Magnuson-Moss Warranty Act class claims; the Alabama plaintiffs' putative class claims under the Alabama Deceptive Trade Practices Act; the claims of Mississippi putative class members for negligent design, negligent failure to warn, fraud or breach of warranty; and the claims of Louisiana putative class members for negligent design, negligent failure to warn, fraud, unjust enrichment or breach of warranty. Defendants state that, as to this particular Rule 56 Motion, "the claims upon which relief was sought [were] limited to purported class claims" (doc. 159, at 1), rather than individual plaintiffs' claims.
After defendants filed this Motion, plaintiffs filed their Motion for Class Certification (doc. 143). On its face, the Rule 23 Motion was confined to the claims of plaintiffs Diane Bowden and Carrie Bowens - the two Alabama plaintiffs - and sought only "class certification of their claims that Defendants ... violated the Alabama Deceptive Trade Practices Act." (Doc. 143, at 1.) No other plaintiffs moved for class certification, and class certification was not sought as to any other claims. As such, defendants' Motion for Summary Judgment on Certain Class Claims is moot as *1198 to the purported class claims under the Magnuson-Moss Warranty Act; the Mississippi subclass claims for negligent design, negligent failure to warn, fraud and breach of warranty; and the Louisiana subclass claims for negligent design, negligent failure to warn, fraud, unjust enrichment and breach of warranty.[7]
The lone issue remaining from the Motion for Summary Judgment on Certain Class Claims is whether defendants are entitled to summary judgment on the class claims asserted under the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 et seq. (the "ADTPA"). The starting point of the analysis is the text of the statute itself. On its face, the present version of the ADTPA unequivocally prohibits class claims, to-wit:
"A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class. The limitation in this subsection is a substantive limitation and allowing a consumer or other person to bring a class action or other representative action for a violation of this chapter would abridge, enlarge, or modify the substantive rights created by this chapter."
Ala. Code § 8-19-10(f) (emphasis added); see also Cheminova America Corp. v. Corker , 779 So.2d 1175, 1183 (Ala. 2000) ("Alabama law prevents consumers from representing a class seeking relief for a defendant's alleged deceptive trade practices, § 8-19-10(f)").
In response, plaintiffs argue that this Court is bound to follow the Eleventh Circuit's ruling in Lisk v. Lumber One Wood Preserving, LLC , 792 F.3d 1331 (11th Cir. 2015). The Lisk court held that "[t]he Alabama statute restricting class actions ... does not apply in federal court. Rule 23 controls." Id. at 1336. Lisk recognized that "[i]f this case were pending in an Alabama state court, the statute would preclude presentation of the ADTPA claims in a private class action. But the case is in federal court," and Rule 23 "makes no exception for cases of this kind." Id. at 1334. In reaching this conclusion, the Eleventh Circuit reasoned as follows: (i) the Rules Enabling Act provides that a federal rule applies in any federal lawsuit, and thus displaces any conflicting state provision, so long as the federal rule does not abridge, enlarge or modify a substantive right; and (ii) "it is difficult to conclude that Rule 23 abridges, enlarges, or modifies a substantive right in Alabama, when all the statute does is prescribe who can bring a class claim based on the very same substantive conduct." Id. at 1335-36.[8]
Defendants counter that because the ADTPA was amended in 2016 - after Lisk was decided - "the analysis in Lisk is effectively based upon a different statute than the one at issue here, and does not *1199 dictate the outcome in this case." (Doc. 159, at 2.) Indeed, defendants go so far as to suggest " Lisk was effectively abrogated by the amendment of the statute." (Id. at 13.) The undersigned disagrees.
To be sure, in May 2016, the Alabama Legislature enacted S.B. 270, which added new language to § 8-19-10(f) to specify that the prohibition on consumers bringing an ADTPA action on behalf of a class "is a substantive limitation and allowing a consumer or other person to bring a class action or other representative action for a violation of this chapter would abridge, enlarge, or modify the substantive rights created by this chapter." 2016 Alabama Laws Act 2016-407 (S.B. 270).[9] As an initial matter, defendants rely on various canons of construction to argue that this Court must apply the current version of § 8-19-10 as written and that the statutory language is controlling. (Doc. 159, at 4-6.) But the issue here is not the meaning or interpretation of the ADTPA. The issue is whether the new language gives rise to a "substantive right" as to which Rule 23 must yield, under application of the Rules Enabling Act, notwithstanding the binding authority of Lisk. Indeed, the only salient question is whether Rule 23 would abridge, enlarge, or modify a substantive right if it were applied in these federal proceedings in lieu of the ADTPA prohibition on class actions brought by individual consumers. Canons of statutory interpretation directed at § 8-19-10(f) are not instructive in answering that question.
It is well settled that a "substantive right" for purposes of applying the Rules Enabling Act is one that inheres in "the rules of decision by which the district court will adjudicate [the plaintiff's] rights." Royalty Network, Inc. v. Harris , 756 F.3d 1351, 1361 (11th Cir. 2014) (citation omitted); see also Lisk , 792 F.3d at 1337. Whether the Alabama legislature chooses to label something a "substantive right" is certainly not dispositive of, and perhaps not even relevant to, to the matter of whether a substantive right actually is at stake for Rules Enabling Act purposes. See Carter v. L'Oreal USA, Inc. , 2017 WL 4479368, *3 (S.D. Ala. Sept. 21, 2017) ("Clearly, the fact that Alabama has deemed ADTPA's limitation on class actions a 'substantive limitation' does not mean that permitting Rule 23 class actions under ADTPA has affected a substantive right provided by the state.").[10] In Lisk , the Eleventh Circuit determined that the ADTPA's bar on consumers bringing class actions (and the concomitant limitation that only the Attorney General or a district attorney may do so) implicated neither substantive rights nor substantive obligations. Rather, the seller's "substantive obligation was to comply with the ADTPA - to make only accurate representations about its product."
*1200 Lisk , 792 F.3d at 1337. And the buyer's "substantive right ... was to obtain wood that complied with Lumber One's representations. These are the 'rules of decision' that will govern the ADTPA claim." Id. The Lisk panel went on to explain that "Rule 23 alters these substantive rights and obligations not a whit; with or without Rule 23, the parties have the same substantive rights and responsibilities." Id. Simply put, Lisk held that Rule 23 does not abridge, enlarge or modify substantive rights - and therefore applies over § 8-19-10(f) pursuant to the Rules Enabling Act - where "[t]he disputed issue is only whether [consumers] may seek redress in one action or must instead bring separate actions." Id. The Lisk analysis remains fully intact after the 2016 amendment to the ADTPA. The substantive rights and obligations conferred by the statute remain the same, and are in no way abridged, enlarged or modified by Rule 23. Pursuant to the clear reasoning of the Lisk court, whether consumers may seek redress in one action or whether they must instead bring separate actions (or rely on the Attorney General or a district attorney to bring a representative action for them) is not a substantive right. That analysis is exactly the same under the current version of ADTPA as it was under the version of ADTPA in effect when Lisk was decided. See Carter , 2017 WL 4479368, at *3 ("Consumers seeking to sue under ADTPA have the same substantive rights and responsibilities under both the old and new ADTPA statute, and they are not abridged by the assertion of class claims under Rule 23.").[11]
For the foregoing reasons, defendants' Motion for Dismissal and/or for Summary Judgment on Certain Claims (doc. 136) is denied as to class claims asserted under the Alabama Deceptive Trade Practices Act, and is moot as to all other issues and arguments asserted therein.
VI. Analysis of Plaintiff-Specific Motions.
A. Plaintiff Breonna Franks.
Plaintiff Breonna Franks, the lone Mississippi named plaintiff, is no longer pursuing class claims against defendants; however, she has asserted individual claims for unjust enrichment (Count I), violation of the Magnuson-Moss Warranty Act (Count II), breach of express warranty (Count III), breach of implied warranty (Count IV), fraud (Count V), and negligent design/failure to warn (Count VI). In their Motion for Summary Judgment on Claims *1201 of Plaintiff Breonna Franks (doc. 139), defendants seek summary judgment on all of Franks' individual claims, on the grounds that (i) Count I fails for lack of proof of essential elements of unjust enrichment; (ii) Count II fails for lack of federal jurisdiction over the Magnuson-Moss Warranty Act claim; and (iii) Counts III through VI are precluded by the Mississippi Products Liability Act, and could not be pleaded in cognizable fashion under the Act, in any event.[12]
1. Unjust Enrichment (Count I).
As to Franks' unjust enrichment claim (Count I), her Complaint alleges that "[d]efendants have reaped millions of dollars in revenue as a direct and proximate result of its [sic ] scheme to mislead and deceive the Plaintiff and Class members regarding its [sic ] unsubstantiated, false, deceptive and/or misleading representations." (Doc. 44, at 31.) Mississippi law (which both sides agree governs Franks' state-law claims) provides that "[u]njust enrichment applies in situations where no legal contract exists, and the person charged is in possession of money or property which, in good conscience and justice, he or she should not be permitted to retain." Willis v. Rehab Solutions, PLLC , 82 So.3d 583, 588 (Miss. 2012) ; see also Carlson v. Brabham , 199 So.3d 735, 744 (Miss.App. 2016) ("Unjust enrichment is defined as money paid to another by mistake of fact.") (citations and internal marks omitted). On its face, Franks' Count I would appear to fit within this definition of "unjust enrichment;" after all, her claim is that defendants used misrepresentations to trick her into buying the Product, as a result of which defendants received money from Franks which in good conscience and justice they should not be permitted to retain.
Nonetheless, defendants contend that Count I is not viable, as a matter of law. In particular, defendants argue that Count I fails because there is no evidence of a "direct relationship" between Franks and any defendant, no evidence that any defendant promised to pay Franks money, and no evidence that any defendant received money directly from her. (Doc. 139, at 12.) Defendants identify no Mississippi appellate authority declaring any of these to be necessary elements for an unjust enrichment cause of action; instead, defendants *1202 rely on unsupported dicta from an unpublished Mississippi federal district court opinion. The remedy of unjust enrichment is equitable. See, e.g., Germany v. Germany , 123 So.3d 423, 431 (Miss. 2013). The only mandatory requirements of proof for such a claim are that (i) "there is no legal contract" between the parties, but (ii) the defendant "is in possession of money or property which in good conscience and justice he should not retain." Franklin v. Franklin ex rel. Phillips , 858 So.2d 110, 121 (Miss. 2003) (citation omitted). Defendants having advanced no persuasive reason why plaintiff's theory of relief could not fit within that paradigm on the existing record, the Motion for Summary Judgment is denied as to Count I.[13]
2. Magnuson-Moss Warranty Act (Count II).
In Count II of her Complaint, Franks alleged that defendants had violated the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq. ("MMWA"), by failing to comply with written warranties as to the Product. Specifically, Franks points to defendants' statements and descriptions on the Product's packaging, website and marketing materials, such as that defendants are "hair color experts," that the Product "softens hair" and contains a "luxurious formula" that is "infused with conditioning botanicals," and that use of the Product is "an easy coloring experience." (Doc. 44, at 34.) The theory animating plaintiff's MMWA claim is that all of these statements are written warranties, and that defendants' breaches of same amount to a violation of the statute.
Defendants move for summary judgment on Count II on the grounds that federal jurisdiction is lacking. On its face, the MMWA provides that no claim brought in federal district court by a consumer for breach of a warranty under the Act "shall be cognizable ... if the amount in controversy of any individual claim is less than the sum or value of $ 25," or "if the amount in controversy is less than the sum or value of $ 50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit." 15 U.S.C. § 2310(d)(3)(A)-(B).[14] There appears to be no record evidence that might support a reasonable inference that Franks' MMWA claim is valued at $ 25.00 or higher or that Franks' claims in the aggregate are valued at $ 50,000 or higher. Plaintiff has made no effort to show otherwise, particularly given that the alleged breach of written warranty relates to *1203 a hair coloring product that appears to have cost $ 5.00 or less, and that Franks never sought medical care or treatment relating to her alleged injuries arising from use of the Product. In the absence of any showing by plaintiff, or other reason to believe, that any of these statutory prerequisites is satisfied, defendants' Motion for Summary Judgment is properly granted as to Count II.
3. Breach of Warranty/Fraud/Negligent Design/Failure to Warn (Counts III - VI).
Defendants also seek summary judgment on Franks' common-law claims of negligent design, negligent failure to warn, breach of warranty and fraud, as pleaded in Counts III through VI of her Complaint. Defendants' threshold argument is that all of these claims are precluded by the Mississippi Products Liability Act (the "MPLA"), which applies to "any action for damages caused by a product, including, but not limited to, any action based on a theory of strict liability in tort, negligence or breach of implied warranty, except for commercial damage to the product itself." Miss. Code § 11-1-63. Substantial case law supports defendants' position that the MPLA applies to the claims raised by Franks in Counts III through VI.[15] That said, courts confronting Mississippi common-law claims similar to those asserted by Franks have not found that such claims must be summarily dismissed (as defendants here advocate); rather, courts have deemed such claims to be subsumed by, analyzed under, and subject to the requirements of the MPLA. See, e.g., Elliott v. El Paso Corp. , 181 So.3d 263, 268 (Miss. 2015) ("To properly analyze the Elliotts' negligence and strict-liability claims, we must look to the Mississippi Products Liability Act," one subsection of which "establishes the plaintiff's prima facie elements in this case").[16] Accordingly, this Court will not summarily dismiss Counts III through VI as precluded by the MPLA, but will analyze them under the MPLA, which "now provides the roadmap for such claims." Elliott , 181 So.3d at 268.[17]
Alternatively, defendants maintain that Counts III through VI are due to be dismissed for failure to meet the essential elements for a viable claim under the *1204 MPLA. To the extent Franks brings claims on a theory of defective design,[18] defendants note that the MPLA requires a plaintiff to prove both that (i) defendants knew or reasonably should have known "about the danger that caused the damage," and (ii) "[t]he product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm." Miss. Code § 11-1-63(f). Defendants argue that Franks' design-defect claims fail under the MPA because the record is devoid of evidence of a feasible design alternative, and because the product would not have failed to function as expected had Franks read the product warnings and instructions. Mississippi case law supports defendants' position that these are elements of a defective-design claim under the MPLA.[19] In response, Franks states in conclusory fashion that "there is an abundance of significant, probative evidence supporting her claims," and directs the Court's attention generically to the "strong, uncontroverted opinions supporting her case" found in the reports of her experts, Tackett and Charlesworth. (Doc. 153, at 16.) She does not identify any specific opinions from her experts about feasible design alternatives, instead waving her hand at the record and suggesting that the answer lies somewhere therein. That is not how the Rule 56 process works. See Civil L.R. 56(b) ("The non-movant's brief must include ... all facts relied upon, each supported by a specific, pinpoint citation to the record."). Franks cannot shift to this Court the burden of sifting through the record to endeavor to locate specific supporting facts and to develop appropriate arguments on her behalf.[20]
As to the failure-to-warn portion of Counts III through VI, the MPLA provides that "[a]n adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary *1205 consumer who purchases the product." Miss. Code § 11-1-63(c)(ii). "In Mississippi, a warning may be held adequate as a matter of law where the adverse effect was one that the manufacturer specifically warned against." Dykes v. Husqvarna Outdoor Products, N.A., Inc. , 869 F.Supp.2d 749, 760 (S.D. Miss. 2012) (citations omitted). Moreover, "[i]nadequate warnings cannot serve as the proximate cause of injuries where adequate warnings would have resulted in the same injuries. Where a plaintiff claims inadequate warnings, the defendant must be allowed to introduce evidence which would tend to persuade a jury that, even if the warnings had been adequate, the plaintiff would not have heeded them." Palmer v. Volkswagen of America, Inc. , 904 So.2d 1077, 1094 (Miss. 2005). Simply put, "where a plaintiff complains that a given warning was defective, the plaintiff must have read and relied upon the defective warning to complain of it." Mine Safety Appliance Co. v. Holmes , 171 So.3d 442, 452 (Miss. 2015) (citation and internal quotation marks omitted).
These principles underscore the infirmities in Franks' failure-to-warn claims under the MPLA. Franks conceded that she had never attempted the skin allergy test as she was specifically directed to do in the Product's warnings and instructions; therefore, any claim that the skin allergy test instructions were defective in some manner is inconsequential to her claims because she did not heed the instructions that were given to "PERFORM THE SKIN ALLERGY TEST 48 HOURS BEFORE COLORING." Franks also acknowledged that, despite experiencing an itching and burning sensation the first time she used the Product, she continued to use it every four to six weeks for a period of three years, all in derogation of defendants' unambiguous warnings stating "DO NOT USE THIS PRODUCT IF YOU HAVE EXPERIENCED ANY REACTION TO HAIR COLOR PRODUCTS." And defendants' warnings repeatedly cautioned Franks that use of the Product "MAY CAUSE ALLERGIC REACTIONS, WHICH IN RARE CASES CAN BE SEVERE," which of course is exactly what happened. These facts demonstrate the following: (i) Franks failed to heed the warnings that were given, thereby negating the purported inadequacy of those warnings as the proximate cause of her injuries; and (ii) Franks' conduct in ignoring certain directives demonstrates that she did not rely on the warnings that were given, so she cannot be heard to complain that such warnings were inadequate.
Franks' claims for breach of implied warranty (Count IV), fraud (Count V), and negligent design/failure to warn (Count VI) are predicated on a defective-design or failure-to-warn theory. For the reasons stated, defendants are entitled to summary judgment on all such claims and causes of action under the MPLA analytical framework.
Notably, defendants' Motion for Summary Judgment does not specifically challenge the viability of Franks' claims for breach of express warranty (Count III). As noted supra , Count III is subsumed by and analyzed under the MPLA. The statute provides for liability where "[t]he product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product." Miss. Code § 11-1-63(a)(i)(4). Defendants' Motion for Summary Judgment analyzes both the design-defect and failure-to-warn claims under the MPLA, but offers no argument that Franks' breach-of-express-warranty claim is not cognizable under subsection (a)(i)(4) of the MPLA. (Doc. 139, at 12-16.) As such, summary judgment is inappropriate as to Count III.
*1206 B. Plaintiff Tara Taylor.
Plaintiff Tara Taylor, the lone Louisiana named plaintiff, is not pursuing class claims against defendants; however, she has asserted individual claims for unjust enrichment (Count I), violation of the Magnuson-Moss Warranty Act (Count II), breach of warranty in violation of Louisiana Civil Code Articles 2475, 2520, and 2524 (Count III), fraud (Count IV), and negligent design/failure to warn (Count V). In their Motion for Summary Judgment on Claims of Plaintiff Tara Taylor (doc. 140), defendants seek summary judgment on all of Taylor's claims, on the grounds that (i) plaintiff's claims are preempted by the Louisiana Products Liability Act, and could not be pleaded in cognizable fashion under the Act, in any event; (ii) plaintiff's claims are time-barred; (iii) plaintiff's fraud and breach-of-warranty claims fail for lack of reliance; and (iv) Count II fails for lack of federal jurisdiction over the Magnuson-Moss Warranty Act claim.
1. Repetitive Issues Governed by Section VI.A.
Multiple aspects of the parties' memoranda briefing the Rule 56 Motion as to Taylor's claims are identical or substantially similar to those presented in their memoranda of law submitted on the Rule 56 Motion as to Franks' claims. Rather than reiterating what has already been written, the Court will simply adopt the relevant portions of Section VI.A. of this Order (addressing the Franks summary judgment motion) as applying with equal force to the Taylor summary judgment motion. The issues addressed in this manner include the following: (i) Taylor's arguments that there has been "very little merits-based discovery" and that she is "entitled to conduct full merits-based discovery before being compelled to respond to this Summary Judgment petition;" (ii) analysis of Taylor's claim under the Magnuson-Moss Warranty Act (Count II); and (iii) discussion of Taylor's evidence concerning feasible alternative design.
2. Timeliness of Complaint.
Defendants contend that all of Taylor's claims are time-barred. In particular, defendants rely on Louisiana authority establishing that a claimant has one year "from the day injury or damage is sustained" in which to bring claims under the LPLA. See, e.g., American Zurich Ins. Co. v. Caterpillar, Inc. , 99 So.3d 739, 741 (La.App. 3 Cir. 2012) ("A claimant has one year 'from the day injury or damage is sustained' in which to file its action.... This prescriptive period applies to claims under the LPLA."); Marable v. Empire Truck Sales of Louisiana, LLC , 221 So.3d 880, 889 (La.App. 4 Cir. 2017) ("This one-year prescription applies to actions brought pursuant to the Louisiana Products Liability Act (LPLA)."); Peterson v. C.R. Bard, Inc. , 654 Fed. Appx. 667, 669 (5th Cir. 2016) (where plaintiff alleged numerous claims under the LPLA, "[a]ll claims are governed by a one year period of prescription"); La.Civ. Code art. 3492. "The prevailing wisdom is that prescription begins to run when the defect manifests itself." American Zurich , 99 So.3d at 741 ; see also Mouton v. Generac Power Systems, Inc. , 152 So.3d 985, 993 (La.App. 3 Cir. 2014) (same); Beth Israel v. Bartley, Inc. , 579 So.2d 1066, 1072 (La.App. 4 Cir. 1991) ("a products liability claim is also subject to a one year limitation from the injury or damage or from the date the victim became aware of the defect").
Taylor's evidence is that she used the Product on October 19, 2016. She testified that on October 20, 2016, she experienced physical manifestations of an adverse reaction to the Product on her head, including itching, blisters and weeping sores. Based on that evidence, defendants have a compelling argument that the one-year prescriptive period began to run for Taylor on *1207 October 20, 2016 (i.e. , that October 20, 2016 was the date on which injury was sustained and the alleged defect manifested itself). Yet Taylor did not file her Complaint until October 23, 2017, more than one year later and therefore beyond the applicable prescriptive period.
In response, Taylor advances three arguments, none of which are persuasive. First, Taylor maintains that the prescriptive period should be deemed to commence on October 21, 2016, which was the day she awakened with a swollen face, received medical treatment, and was diagnosed with contact dermatitis.[21] Again, the legal standard is that the claimant has one year "from the day injury or damage is sustained" or from the date "the defect manifests itself." Taylor applied the Product on October 19, 2016, and the very next day experienced severe symptoms, including blisters on her head that were "leaking." Under any reasonable application of the standard, Taylor sustained her injury - and the alleged defect in the Product manifested itself - no later than October 20, 2016, when these symptoms appeared.
Second, Taylor invokes the doctrine of contra non valentem agere nulla currit , which is Latin for "a prescription does not run against one who is unable to act." "Under Louisiana law, contra non valentum prevents the commencement of the running of prescription when the plaintiff does not know nor ... reasonably should know of the cause of action." Firefighters' Retirement System v. Grant Thornton, L.L.P. , 894 F.3d 665, 673 (5th Cir. 2018) (footnote and internal quotation marks omitted); see also Terrebonne v. Theriot , 657 So.2d 1358, 1362-63 (La.App. 1 Cir. 1995) ("It is well-settled that prescription does not run against one who is ignorant of the facts upon which his cause of action is based as long as such ignorance is not willful, negligent or unreasonable."). On this record, contra non valentem cannot save Taylor's claims from the running of the prescriptive period. Again, one day after applying the Product, Taylor experienced a severe reaction, including blisters and weeping sores on her head. She knew or reasonably should have known the facts upon which her cause of action was based no later than that date, October 20, 2016; therefore, the prescriptive period commenced then, and her Complaint is untimely.[22]
Third, Taylor suggests that the prescriptive period could not have begun on October 20, 2016 because she did not know "that the Product contained PPD and/or the true nature of the dangers associated with PPD, and/or that the Product's 'skin allergy test' is woefully inadequate ... until after she had been diagnosed with 'contact dermatitis.' " (Doc. 154, at 26.) Again, the legal standard is when she became aware of the facts upon which her claims are based. Those facts, at their most fundamental, are her use of the Product and her ensuing adverse reaction on October 20. Surely those facts were sufficient to place her on notice that the Product was defective, such that she might have a viable LPLA claim against defendants.
*1208 That said, this argument is sufficient to toll the prescriptive period (at least, for summary judgment purposes) as it relates to Taylor's failure-to-warn claims, as discussed in footnote 23, infra.
For all of these reasons, the Court finds that Taylor's claims (with the exception of her inadequate warning claim under the LPLA) are time-barred by operation of the one-year prescriptive period that applies to claims under the LPLA. Defendants are therefore entitled to summary judgment on all claims and causes of action asserted by Taylor, other than Taylor's claim of inadequate warning pursuant to the LPLA.[23]
3. The Louisiana Products Liability Act.
Even if Taylor's Complaint were not time-barred, defendants would remain entitled to summary judgment. By its terms, the Louisiana Products Liability Act "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. Rev. Stat. § 9:2800.52 ; see also American Zurich , 99 So.3d at 743 ("The LPLA is the exclusive remedy against a manufacturer of a defective product."); Scott v. American Tobacco Co. , 949 So.2d 1266, 1273 (La.Ct.App. 2007) ("The LPLA provides the exclusive theory of liability available to persons claiming a product defect after September 1, 1988"). Taylor is suing defendants for damage allegedly caused by the Product; therefore, the LPLA plainly applies here.
Where the LPLA applies, "[a] claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in" the LPLA. La. Rev. Stat. § 9:2800.52 ; see also Fernandez v. Tamko Bldg. Products, Inc. , 2 F.Supp.3d 854, 858 (M.D. La. 2014) ("The LPLA contains an exclusive remedy provision limiting a plaintiff's theories of recovery against a manufacturer of an allegedly defective product to those established by the LPLA."). "The LPLA sets forth four exclusive theories of recovery against a manufacturer: (1) defect in construction or composition, (2) defect in design, (3) inadequate warning or (4) failure to comply with an express warranty." Colbert v. Sonic Restaurants, Inc. , 741 F.Supp.2d 764, 772 (W.D. La. 2010) ; see also La. Rev. Stat. § 9:2800.54(B) ("A product is unreasonably dangerous if and only if: (1) The product is unreasonably dangerous in construction or composition ...; (2) The product is unreasonably dangerous in design ...; (3) The product is unreasonably dangerous because an adequate warning about the product has not been provided ...; or (4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product...."). Insofar as Taylor's claims go outside the boundaries of those permissible theories of LPLA liability (including specifically the unjust enrichment claim found at Count I, claims for breach of *1209 implied warranty at Count III, and the fraud claim found at Count IV), such claims fail as a matter of law and must be dismissed. See, e.g., Jefferson v. Lead Industries Ass'n, Inc. , 930 F.Supp. 241, 245 (E.D. La. 1996) ("It is apparent from the foregoing discussion of the exclusivity of the LPLA that plaintiff's allegations of negligence, fraud by misrepresentation, ... [and] breach of implied warranty of fitness ... fail to state a claim against the ... manufacturers under the LPLA and must therefore be dismissed"); Ervin v. Guidant Corp. , 2010 WL 3081306, *2 (E.D. La. Aug. 5, 2010) ("courts applying Louisiana law have frequently dismissed cases that assert theories of fraud, negligence, and misrepresentation because such claims are outside the scope of the LPLA").
That said, a fair reading of Taylor's Complaint is that she also pleads claims for defective design, failure to warn, and breach of express warranty, all of which are recognized theories of LPLA liability. See Jefferson , 930 F.Supp. at 245 ("Plaintiff does attempt to assert a claim for defective design, failure to warn, and breach of express warranty, which are cognizable liability theories under the LPLA"). Nonetheless, defendants urge the Court to dismiss all such claims as preempted because Taylor failed to identify the LPLA by name in pleading those causes of action. Defendants cite no authority supporting the proposition that summary dismissal of any claim not labeled in the pleading as being brought under the LPLA is required or appropriate. Federal district courts in Louisiana have declined to apply such a stringent pleading requirement, but have instead allowed claims on cognizable LPLA theories even where a complaint fails to cite the LPLA by name. See, e.g., Becnel v. Mercedes-Benz USA, LLC , 2014 WL 1918468, *7 (E.D. La. May 13, 2014) ("By alleging that MBUSA's product is defective and that MBUSA is the manufacturer, Becnel clearly invokes the LPLA even if he does not do so expressly."); King v. Bayer Pharmaceuticals Corp. , 2009 WL 2135223, *5 (W.D. La. July 13, 2009) ("the factual allegations support claims under the LPLA, even though Plaintiffs' complaint used titles for their claims that fell outside the LPLA"); Brennon v. Pfizer, Inc. , 2009 WL 2525180, *3 (W.D. La. Aug. 17, 2009) ("Although Brennon's petition uses titles which allude to non-LPLA claims, Brennon's petition does contain the requisite factual allegations to state a claim under the LPLA."). This Court will do the same, and will consider plaintiff's defective design, failure to warn, and breach of express warranty claims (Counts III and V) under the LPLA framework notwithstanding Taylor's failure to namecheck the LPLA in her Complaint.
Alternatively, defendants assert that each of Taylor's LPLA claims must be dismissed because she has not shown, and cannot show, essential elements. With respect to Taylor's claim of defective design, the LPLA expressly requires as an element of such a claim that the plaintiff prove "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage." La. Rev. Stat. § 9:2800.56. Such proof generally requires expert testimony or technical evidence. See, e.g., Broussard v. Procter & Gamble Co. , 463 F.Supp.2d 596, 611 (W.D. La. 2006) ("the plaintiff must come forward with scientifically viable evidence to show that the alternative design would have prevented her injuries"); McCarthy v. Danek Medical, Inc. , 65 F.Supp.2d 410, 412 (E.D. La. 1999) ("Without expert or technical evidence ... to establish an alternative design, plaintiff has failed to create an issue of fact to be left to a jury."). As discussed in the context of the Franks summary judgment motion in § VI.A.3., supra , plaintiff's evidence of alternative design is wholly inadequate *1210 to carry her burden of proof on this essential element of her claim. Accordingly, Taylor's design-defect claim is unsustainable, as a matter of law.[24]
With respect to Taylor's inadequate-warning claim, the LPLA allows for liability where "the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. Rev. Stat. § 9:2800.57(A). No warning is required where the consumer "already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic." § 9:2800.57(B)(2). Taylor theorizes that defendants' warnings were inadequate as to "the risks and potential dangers of using the defective Product as directed by Defendants." (Doc. 86, at 52.) As discussed, the Product as sold came with extensive warnings and instructions as to potential dangers of using it as directed. For example, the box warned that the Product "MAY CAUSE ALLERGIC REACTIONS, WHICH IN RARE CASES CAN BE SEVERE;" that the Product "CONTAINS INGREDIENTS THAT MAY CAUSE SKIN IRRITATION ON CERTAIN INDIVIDUALS;" and that the consumer should not use the Product "IF YOU HAVE EXPERIENCED ANY REACTION TO HAIR COLOR PRODUCTS" or "HAVE SENSITIVE, IRRITATED OR DAMAGED SCALP." The trouble for plaintiff is that Taylor's own testimony showed that she disregarded the warnings and instructions given, inasmuch as she used the Product even though she had previously had a reaction to another hair color product; she had an existing condition of scalp irritation; and she failed to perform a skin allergy test in a manner even approximating that described by the instructions. Because Taylor did not follow the existing warnings and instructions, she cannot establish causation (i.e. , that her injuries would not have occurred if more detailed or extensive warnings had been given). See, e.g., Hinson v. Techtronic Industries Outlets, Inc. , 126 F.Supp.3d 747, 758 (W.D. La. 2015) (dismissing inadequate-warning claim where "plaintiff admitted he did not follow the safety and maintenance instructions in the Operator's Manual" and "there is no reasonable basis to believe that even if defendants had included a warning that the handle of the pressure washer might break, the plaintiff would have altered his actions," such that "any warning would have been futile and the plaintiff cannot prove causation"); Fernandez , 2 F.Supp.3d at 862 (granting summary judgment on inadequate-warning claim "Plaintiff has failed to show how the type of warning he contends would have been appropriate ... would have changed the outcome of the accident since it is unlikely that Plaintiff would have heeded that warning either"). Summary judgment is warranted on Taylor's inadequate-warning claim.
Finally, defendants seek summary judgment on Taylor's claim for breach of express warranty. Under the LPLA, defendants can be liable for the Product's failure to conform to an express warranty "if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage *1211 was proximately caused because the express warranty was untrue." La. Rev. Stat. § 9:2800.58 (emphasis added). Even assuming that the statements identified by Taylor's Complaint fall within the statutory definition of an "express warranty" (which is debatable, at best), this claim fails as a matter of law because the summary judgment record lacks any evidence that such express warranties induced Taylor to use the Product. Taylor makes no showing that she was induced to use the Product by warranties on the packaging; rather, she testified that she came to use it because she was working at Family Dollar, "putting the stuff on the shelves," and thereby "discovered the Balsam hair color." (Taylor Dep., at 21.) There is zero evidence that any express warranties induced Taylor to use the Product; therefore, her breach-of-express-warranty claim under the LPLA is not, and cannot be, viable.
For all of the foregoing reasons, defendants' Motion for Summary Judgment as to the claims of plaintiff Tara Taylor is due to be granted in its entirety.[25]
C. Plaintiffs Diane Bowden and Carrie Bowens.
1. Non-ADTPA Claims are Waived.
The claims of the last two plaintiffs, Diane Bowden and Carrie Bowens, will be considered together. Each of Bowden and Bowens is an Alabama plaintiff who filed a Complaint asserting claims of unjust enrichment (Count I), violation of the Magnuson-Moss Warranty Act (Count II), breach of express warranty (Count III), breach of implied warranty (Count IV), violation of the Alabama Deceptive Trade Practices Act (Count V), fraud (Count VI) and negligent design/failure to warn (Count VII). (Docs. 25-1, 29-1.) Bowden and Bowens have moved for class certification as to their claims under the Alabama Deceptive Trade Practices Act (Count V), but not for any of their other causes of action. In their summary judgment briefs, Bowden and Bowens acknowledge that each of them "has procedurally waived her right to seek redress under any of her Complaint's other legal claims." (Doc. 155, at 15-16; doc. 156, at 16.)[26] Accordingly, defendants' Motions for Summary Judgment *1212 are granted as to Counts I, II, III, IV, VI and VII of Bowden's and Bowens' Complaints, and all such claims are dismissed .
The only question, then, is whether Bowden's and Bowens' claims under the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 et seq. ("ADTPA"), are viable. Among other things, the ADTPA declares unlawful the act or practice of "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(27). As framed in the Complaints, Bowden's and Bowens' ADTPA claims center on allegations that defendants misled and deceived the public by "advertis[ing], market[ing], and [selling] the Product as being a safe hair dyeing product," while concealing information about the Product's risks of injury, failing to call attention to the Product's dangerous propensities, and otherwise engaging in false, misleading, and/or deceptive practices in marketing, advertising, and selling the Product. (Doc. 29-1, at ¶¶ 155-56; doc. 25-1, at ¶¶ 150-51.) Defendants seek summary judgment on these ADTPA claims on the grounds that (i) they are barred by the statute of limitations; and (ii) the record establishes that defendants engaged in no deceptive or misleading acts or practices.[27]
2. Timeliness of ADTPA Claims.
The ADTPA provides that "[n]o action may be brought under this chapter more than one year after the person bringing the action discovers or reasonably should have discovered the act or practice which is the subject of the action." Ala. Code § 8-19-14. As a matter of well-settled Alabama law, "[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud." Wheeler v. George , 39 So.3d 1061, 1082-83 (Ala. 2009) (citations omitted); see also Miller v. City of Birmingham , 235 So.3d 220, 234 (Ala. 2017) (same).
Defendants argue that both Bowden and Bowens brought their ADTPA claims outside the requisite one-year limitations period. As to Bowden, the record reflects that she experienced an adverse reaction upon using the Product in January 2016, but did not file her Complaint in the U.S. District Court for the Northern District of Alabama until February 28, 2017. (Doc. 29-1, at 1, 29.) Bowden also offers a Declaration in which she avers that the first time she *1213 "learned about the problems with the hair dye and the false and misleading nature of the labeling" was when she met with counsel "in late January or early February of 2017," mere weeks before filing her Complaint. (Bowden Decl. (doc. 155, Exh. G), ¶ 3.) As to Bowens, the record reflects that she first used the Product in January or February 2016, and experienced an adverse reaction at that time, and that she filed her Complaint in the U.S. District Court for the Middle District of Alabama on March 1, 2017. Bowens also submitted a Declaration in which she avers that the first time she "learned about the problems with the hair dye and the false and misleading nature of the labeling" was when she met with counsel "in late January or early February of 2017," shortly before filing her Complaint. (Bowens Decl. (doc. 155, Exh. H), ¶ 3.)
After careful review of the parties' arguments, the Court finds that a jury question is presented as to whether Bowden and Bowens discovered or reasonably should have discovered the acts and practices which are the subject of their ADTPA claims within one year before their February 28, 2017 and March 1, 2017, complaint filing dates, respectively. Again, on summary judgment, Alabama law provides that courts can decide the issue of discovery of a claim as a matter of law "only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud." Wheeler , 39 So.3d at 1082-83. The Court cannot unequivocally find on this record that Bowden and Bowens possessed such knowledge as of February/March 2016. To be sure, plaintiffs knew they had experienced an adverse reaction to the Product. But did they actually know what labeling information, warnings and directions had been placed on the Product at that time? Did they have actual knowledge that the Product's "true, unreasonably dangerous nature" was more extreme than the warnings and directions on the packaging would suggest? Did they have actual knowledge that "use of the Product posed a significant risk of chemical burns, ... particularly among African Americans," such that there should have been specific warnings on those matters? These and other allegations are pleaded in the Complaint as the theory animating these plaintiffs' ADTPA claims. (See doc. 29-1, at ¶ 155; doc. 25-1, at ¶ 150.)
In short, the appropriate question on summary judgment under the Alabama standard for determining when a claim was discovered is whether plaintiffs had actual knowledge as of January/February 2016 that the warnings on the Product were misleading or deceptive. The Court cannot make such a finding as a matter of law on this record; therefore, the timeliness vel non of these ADTPA claims is not an issue subject to resolution on summary judgment.[28]
3. Substantive Merits of ADTPA Claims.
As discussed supra , the ADTPA claims asserted by Bowden and Bowens are predicated on the argument that the warnings contained on the Product were deceptive and misleading because they omitted information about the danger of the Product and the severity of the risk of using it. Notably, that theory is bolstered *1214 by opinions of plaintiffs' expert Randall L. Tackett, Ph.D. In his report, Tackett offered the opinion that "[t]he current labeling is inadequate and misleading. It does not sufficiently warn consumers of the dangers of the hair dyes. The recommended self skin testing described on the label and in the instructions is inadequate in reducing the risk of using the products." (Doc. 155, Exh. B at 12.) Tackett's report also offers supporting facts and reasoning for this opinion.[29] These opinions create genuine issues of fact as to whether plaintiffs were "in anyway [sic ] deceived or mislead [sic ] as to the relative safety of the product" (doc. 142, at 22), thus defeating defendants' argument that "the specificity and redundancy of the warnings and instruction provided" (id. ) negates all of plaintiffs' claims predicated on deceptive, misleading or inadequate warnings.
In addition to their unsuccessful argument that the warnings were adequate, non-deceptive and non-misleading as a matter of law, defendants adopt the position on summary judgment that this ADTPA theory fails on the merits upon a plaintiff-specific analysis. Plaintiff Diane Bowden testified in her deposition that she did not read any of the writing on the box (except to confirm the color of the dye) when she purchased the Product for the first and only time in January 2016. She further conceded that she did not review the leaflet inside the Product's box. As defendants correctly observe, these admissions pose an insuperable obstacle to Bowden's ability to maintain a claim of deceptive/ misleading labeling under the ADTPA. As the Alabama Supreme Court has held, "a plaintiff who does not read an allegedly inadequate warning cannot maintain a negligent-failure-to-adequately-warn action unless the nature of the alleged inadequacy is such that it prevents him from reading it." E.R. Squibb & Sons, Inc. v. Cox , 477 So.2d 963, 971 (Ala. 1985) ; see also Garrison v. Sturm, Ruger & Co. , 322 F.Supp.3d 1217, 1232-33 (N.D. Ala. 2018) ("[T]he court need not resolve whether the provided warning was necessary or adequate, because Garrison did not read the instruction manual containing the warning in the first instance. To submit a negligent failure-to-warn claim to a jury, there must be substantial evidence that the allegedly inadequate warning would have been read and heeded.") (citations and internal quotation marks omitted);
*1215 Barnhill v. Teva Pharmaceuticals USA, Inc. , 819 F.Supp.2d 1254, 1261-62 (S.D. Ala. 2011) (similar); Chase v. Kawasaki Motors Corp., USA , 140 F.Supp.2d 1280, 1288 (M.D. Ala. 2001) ("Because Alabama law bars a plaintiff who does not read an allegedly inadequate warning from maintaining a failure to warn action, summary judgment is due Defendants on this claim.").[30] Simply put, Bowden's ADTPA claim fails as a matter of law because she did not read the allegedly misleading warning; therefore, she cannot show a causal link between the allegedly deceptive practice and the injury. Defendants are entitled to summary judgment on Bowden's ADPTA cause of action.
By contrast, plaintiff Carrie Bowens testified that she did read the safety warnings, instructions, and ingredient list on the Product box, as well as the warnings on the permanent color bottle. While these facts (which are accepted as true for summary judgment purposes) would appear fatal to any "read-and-heed" argument for dismissal of Bowens' ADTPA claim, defendants nonetheless maintain that they are entitled to summary judgment because Bowens "did not follow the manufacturer's instructions before using the Product," such that she "cannot establish that was misled ... or that any alternative warnings of [sic ] instructions would have prevented the alleged injury." (Doc. 142, at 25.) In so arguing, defendants cite the following three record facts: (i) she performed the skin allergy test for "[a]bout a day and a half" rather than the 48 hours instructed in the Product's leaflet; (ii) she failed to perform a "strand test;" and (iii) she wore a shower cap over the Product for the entire 15 minutes it was in her hair. (Id. at 23-24.) As to the first point, the Court finds that a jury question is presented as to whether Bowens substantially complied with the instructions for the skin allergy test, particularly given the paucity of evidence that the additional half day would have made any difference; as well as the absence of any authority cited by defendants to show that Alabama's "read-and-heed" doctrine mandates strict compliance with all product instructions. On this record, the Court cannot say as a matter of law that Bowens' performance of a skin allergy test for 36 hours rather than 48 hours destroys any causal link between the allegedly misleading and deceptive warnings and her injury. As to the second point, defendants' Product did not identify the "strand test" as a warning or a safety instruction, but simply characterized it as a tool "to determine optimal timing and color results." (Doc. 142, Exh. C.) Accordingly, a reasonable jury could find that Bowens' failure to perform the strand test says nothing about her willingness to read and heed specific safety warnings on the Product, and therefore does not bear on the issue of proximate causation. As to the third point, defendants point to no evidence anywhere that Bowens' use of a shower cap was somehow noncompliant with the safety instructions and warnings on the Product. For all of these reasons, defendants are not entitled to summary judgment on Bowens' ADTPA claim for deceptive and misleading warnings.[31]
*1216 VII. Conclusion.
For all of the foregoing reasons, it is ordered as follows:
1. Defendants' Motion for Summary Judgment on Claims of Shamika Jones (doc. 137) is moot ;
2. Defendants' Motion to Strike Expert Opinions (doc. 157) is denied ;
3. Defendants' Motion to Strike Select Portions of Plaintiffs' Opposition (doc. 158) is denied ;
4. Defendants' Motion for Dismissal and/or for Summary Judgment on Certain Class Claims (doc. 136) is denied as to class claims asserted under the Alabama Deceptive Trade Practices Act, and is moot as to all other issues and arguments asserted therein;
5. Defendants' Motion for Summary Judgment on Claims of Breonna Franks (doc. 139) is granted in part , and denied in part . The Motion is granted as to Counts II (Magnuson-Moss Warranty Act), IV (breach of implied warranty), V (fraud) and VI (negligent design/failure to warn), and all such claims are dismissed with prejudice . The Motion is denied as to Counts I (unjust enrichment) and III (breach of express warranty) brought by plaintiff Breonna Banks;
6. Defendants' Motion for Summary Judgment on Claims of Tara Taylor (doc. 140) is granted . All claims brought by plaintiff Tara Taylor are dismissed with prejudice ;
7. Defendants' Motion for Summary Judgment on Claims of Diane Bowden (doc. 141) is granted . All claims brought by plaintiff Diane Bowden are dismissed with prejudice ;
8. Defendants' Motion for Summary Judgment on Claims of Carrie Bowens (doc. 142) is denied as to Count V (ADPTA), but granted as to all other claims, which are dismissed with prejudice ; and
9. The parties are ordered to show cause , on or before September 28, 2018 , why the surviving individual claims of plaintiff Breonna Franks should not be dismissed for lack of federal subject-matter jurisdiction.[32]
DONE and ORDERED this 14th day of September, 2018.

Also pending is defendants' Motion for Summary Judgment on Claims of Shamika Jones (doc. 137). On August 21, 2018, this Court entered an Order (doc. 165) and Judgment (doc. 166) dismissing Jones' Complaint for failure to prosecute and obey the Court's orders. As such, the Motion for Summary Judgment on Claims of Shamika Jones is MOOT .

The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. See Smith v. LePage , 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment.... Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor. Also, federal courts cannot weigh credibility at the summary judgment stage. See Feliciano v. City of Miami Beach , 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." Burnette v. Taylor , 533 F.3d 1325, 1330 (11th Cir. 2008).

For purposes of this discussion, the Court references the packaging material images included as exhibits on defendants' Rule 56 Motion addressing the claims of plaintiff Shamika Jones. There is no indication that the warnings, instructions, disclosures and other statements on the packaging of the Product used by any of the other named plaintiffs differed materially from the description presented as to the Jones packaging.

See, e.g., Stephens v. Broward Sheriff's Office , 84 F.Supp.3d 1327, 1335 n.6 (S.D. Fla. 2014) (overruling objection to unverified expert report on summary judgment, where "[t]here is no dispute that the facts contained within the expert report could be reduced to admissible evidence at trial (presumably, the expert would testify), and Rule 56(c)(2) states that objection is proper only when the facts cannot be presented in an admissible form."); SE Property Holdings, LLC v. Center , 2016 WL 7493623, *14 n.28 (S.D. Ala. Dec. 30, 2016) (considering unsworn expert appraisals because "[s]uch evidence is not admissible in its present form; nonetheless, it is properly considered on summary judgment because all indications are that defendants can reduce it to admissible form ... at trial."); Kearney Construction Co. LLC v. Travelers Casualty & Surety Co. of America , 2017 WL 2172200, *2 (M.D. Fla. Apr. 19, 2017) ("There appears no dispute that the facts contained within the expert report could be reduced to admissible evidence at trial, and Rule 56(c)(2) states that objection is proper only when the facts cannot be presented in an admissible form.").

In their Objection, defendants rely principally on dicta from Carr v. Tatangelo , 338 F.3d 1259, 1273 n.26 (11th Cir. 2003), in which the Eleventh Circuit determined that an expert witness's preliminary report should not be considered on summary judgment because it did not meet the requirements for a summary judgment affidavit as prescribed by Rule 56(e). The Carr court reasoned, "Importantly, the alleged expert's report is unsworn. Only 'pleadings, depositions, answers to interrogatories, and admissions on file , together with affidavits , can be considered by the district court in reviewing a summary judgment motion. Fed.R.Civ.P. 56(c) (emphasis added).' " Carr , 338 F.3d at 1273 n.26. But Rule 56(c) was amended in 2010 in a manner that undercuts defendants' reliance on Carr. In its present formulation, Rule 56(c) authorizes district courts reviewing summary judgment motions to consider "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials ." Rule 56(c)(1)(A), Fed.R.Civ.P. (emphasis added). By all appearances, the unsworn reports of Tackett and Charlesworth constitute "other materials" that may properly be considered on summary judgment so long as they are capable of being reduced to admissible form at trial. This determination works no unfair prejudice on defendants and avoids the elevation of form over substance, particularly given that plaintiffs' expert opinions expressed in their reports can obviously be presented in admissible form at trial by having them testify.

For example, defendants point to plaintiffs' counsel's statements that "PPD is well known to be an extremely potent allergen" and that "this 48 hour 'Skin Allergy Test' is scientifically incapable of warning of and/or protecting consumers." (Id. at 9, 11.)

Both sides have acknowledged as much. See doc. 159, at 1 ("the majority of the arguments raised by Defendants have essentially been rendered moot ... as Plaintiffs intentionally abandoned all nationwide class claims.... Defendants[ ] perceive that the only issue raised in this filing [Doc. 136] which remains live for adjudication is whether the amended ADTPA creates a private right and remedy empowering consumers to enforce the ADTPA in a representative capacity."); doc. 152, at 8-9 ("Plaintiff Bowden and Plaintiff Bowens acknowledge that ... they have procedurally waived their rights to seek redress under the Magnuson-Moss Warranty Act pursuant to the ADTPA's 'savings clause'.").

Pursuant to the Rules Enabling Act, "[t]he Supreme Court shall have the power to prescribe general rules of practice and procedure ... for cases in the United States district courts," that "[s]uch rules shall not abridge, enlarge or modify any substantive right," and that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2072(a) -(b).

The 2016 amendment retains language from the previous version that "the office of the Attorney General or district attorney shall have the authority to bring action in a representative capacity on behalf of any named person or persons;" however, it moves that text from subsection (f) to subsection (g), prefaces it with the word "only," and is phrased in terms of "right and authority," rather than just "authority." Id.

Defendants' position is that the Alabama legislature's characterization of its restrictions on class actions in ADTPA claims as a "substantive right" is both conclusive and binding. (Doc. 159, at 9 ("the plain language of § 8-10-10(f) [sic ] conclusively establishes that the Rules Enabling Act would be violated by the use of Rule 23 to allow a consumer to bring a class or other representative action for an alleged violation of the ADTPA - the Alabama Legislature unequivocally declared that it would").) But defendants offer no persuasive explanation or authority for why a state legislature's act of labeling something a "substantive right" should be dispositive (or even particularly instructive) for Rules Enabling Act purposes.

In Lisk , the Eleventh Circuit was applying a Supreme Court case styled Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co. , 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010). Defendants' efforts to frame the ADTPA's prohibition on consumers bringing class actions as a "substantive right" lean heavily on Justice Stevens' concurrence in Shady Grove. But the Lisk court determined that it was "unnecessary to decide whether the further binding opinion is that of the plurality or Justice Stevens" in Shady Grove because its ruling "squares with the views set out not only in Justice Scalia's majority opinion in Shady Grove (the portion of his opinion joined by five justices and thus constituting the opinion of the Court) but also with the views set out in both Justice Scalia's plurality opinion and in Justice Stevens's concurrence." 792 F.3d at 1336. As Lisk explained, "[o]f critical importance here, all five justices agreed that applying Rule 23 to allow a class action for a statutory penalty created by New York law did not abridge, enlarge, or modify a substantive right; Rule 23 controlled. Regardless of which Shady Grove opinion is binding, the holding is binding." Id. at 1335. Just as that Shady Grove holding dictated the outcome in Lisk , so too it informs the decision here. Nothing in the 2016 amendment to the ADTPA alters this analysis or conclusion. The Court therefore rejects defendants' position that resolving which Shady Grove opinion is controlling "is material and necessary to the substantive/procedural analysis under the current ADTPA." (Doc. 159, at 7 n.4.) It is no more necessary to resolve that thorny question here than it was in Lisk.

In her Response to the Motion for Summary Judgment, Franks balks that "very limited merits-based discovery has taken place up to this point," and argues that she "is entitled to conduct full merits-based discovery before being compelled to respond to this Summary Judgment petition." (Doc. 153, at 16-17.) Such objections are unpersuasive for two independent reasons. First, the applicable Rule 16(b) Scheduling Orders provide that "[a]ll discovery involving the claims of the named plaintiffs" was to be completed by no later than May 30, 2018. (See docs. 36, 61, 72.) The Court has no information and no reason to believe that the parties have not complied with that aspect of the Scheduling Orders. Second, insofar as Franks might believe that she is unable to respond to the Motion for Summary Judgment without additional facts, her recourse was to seek relief under Rule 56(d), which may allow for additional time to conduct discovery before adjudication of a summary judgment motion where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Rule 56(d), Fed.R.Civ.P. Franks has made no such showing under Rule 56(d) ; therefore, she is ineligible for the relief authorized by that subsection. See, e.g., Virgilio v. Ryland Group, Inc. , 680 F.3d 1329, 1338 (11th Cir. 2012) ("Because the burden on a party resisting summary judgment is not a heavy one, one must conclusively justify his entitlement to the shelter of [Rule 56(d) ] by presenting specific facts explaining the inability to make a substantive response.") (citation omitted); Church v. Accretive Health, Inc. , 2014 WL 7184340, *13 (S.D. Ala. Dec. 16, 2014) ("The burden for showing entitlement to relief under Rule 56(d) rests with [the summary judgment nonmovant].").

Defendants' alternative argument is that the record facts simply do not support Franks' claim that defendants' misrepresentations deceived and misled her into purchasing the Product. According to plaintiff, the premise of Count I is that "[m]oney was paid to Defendants by Franks' [sic ] under the mistaken belief Defendants' product was something it was and is not; specifically, by virtue of Defendants 'making false, deceptive and/or misleading representations in advertisements and on the labels and/or package inserts/instructions of the Product.' " (Doc. 153, at 21.) There are genuine issues of material fact on this point. After all, Franks testified in her deposition that before purchasing the Product for the first time, she "read the instructions here, all the words that were on the box back then," and that she understood all the words on the box. (Franks Dep., at 46-47.) A fact question is thus presented as to whether Franks would have paid money to defendants in the absence of what she describes as deceptive and misleading representations on the Product box.

A third subsection bars civil claims for violations of the MMWA from being litigated via class action where "the number of named plaintiffs is less than one hundred." Id. This subsection likewise weighs against Franks' attempt to sustain a viable MMWA claim because (i) the number of named plaintiffs in this putative class action is far less than 100, and (ii) neither Franks nor any other plaintiff has moved for class certification as to a MMWA cause of action.

See Elliott v. El Paso Corp. , 181 So.3d 263, 268 (Miss. 2015) ("the MPLA has abrogated products-liability claims based on strict-liability or negligence theories, and the MPLA now provides the roadmap for such claims"); Holifield v. City Salvage, Inc. , 230 So.3d 736, 740 (Miss.App. 2017) ("As amended, it is clear that the MPLA applies in any action for damages caused by a product, including, but not limited to any action based on a theory of strict liability in tort, negligence or breach of implied warranty.... The amendment was effective July 1, 2014.") (citation and internal marks omitted).

See also Young v. Bristol-Myers Squibb Co. , 2017 WL 706320, *3 (N.D. Miss. Feb. 22, 2017) ("common law claims based on damages caused by a product are subsumed by the MPLA and must be analyzed under the statute"); Mildemont, Inc. v. Ford Motor Co. , 2017 WL 151400, *6 (S.D. Miss. Jan. 13, 2017) ("To the extent Plaintiff raises common law negligence claims, they are subsumed by and subject to the requirements of the MPLA."); Little v. Smith & Nephew, Inc. , 2015 WL 3651769, *5 (N.D. Miss. June 11, 2015) ("the current MPLA subsumes actions for damages caused by a product based on negligence"); Murray v. General Motors, LLC , 2011 WL 3684517, *3 (S.D. Miss. Aug. 22, 2011) ("when a plaintiff's negligence claim cannot survive apart from his MPLA claim, regardless of how the plaintiff labels the claims, ... the claim is governed by the MPLA").

In light of this determination, the parties' skirmish as to whether Franks should or should not be permitted to amend her Complaint at this late date to label Counts III through VI as claims under the MPLA need not be resolved. (Doc. 153, at 18-20; doc. 160, at 2-5.)

This theory features prominently in Franks' Complaint. For example, in Count III, she alleged that "the Product suffers from latent and/or inherent design and/or manufacturing defects that cause substantial Injuries, rendering the Product unfit for its intended use and purpose." (Doc. 44, at 38 ¶ 130.) In Count IV, she alleged that the Product "is unreasonably dangerous and unfit for the ordinary purpose for which it was used." (Id. at 40 ¶ 141.) In Count V, she alleged that "the Product is not a safe hair dyeing product" because "it is composed of caustic ingredients including PPD." (Id. at 43 ¶ 162.) And in Count VI, she alleged that defendants had "[n]egligently design[ed] a Product with serious safety hazards and risks." (Id. at 47 ¶ 177(d).)

See, e.g., Guy v. Crown Equipment Corp. , 394 F.3d 320, 331 (5th Cir. 2004) ("Judgment as a matter of law was properly granted. Guy failed to provide the requisite evidence for a MPLA feasible design alternative."); Elliott , 181 So.3d at 272 (under the MPLA, "a plaintiff making a design-defect claim must prove by the preponderance of the evidence the existence of a feasible design alternative").

At best, Tackett's report includes a bald statement that "[t]here are several safer hair dye products available as alternatives." (Doc. 153, Exh. B, at 12.) This opinion does not appear to have been fleshed out with supporting facts anywhere in his report. Even if it had, merely asserting that there are "safer" products available does not satisfy this element. The MPLA unambiguously provides that "[a] feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." § 11-1-63(f)(ii). Tackett's conclusory opinion says nothing about whether those alternative products would have satisfied this statutory definition as to either prevention of harm or usefulness of the Product.

If October 21, 2016 were the commencement date, then Taylor's Complaint would be timely because October 21, 2017 and October 22, 2017 were a Saturday and Sunday, respectively, such that the one-year period would have expired on October 23, 2017, the exact date on which she filed her Complaint.

In arguing otherwise, plaintiff cites evidence that Taylor is a high-school dropout with no expertise in dermatology or toxicology, and that she "does not even know what dermatitis is." (Doc. 154, at 24, 27.) But Taylor did not need a scientific background, an understanding of medical terminology, or a high school diploma to be aware of the facts on which her claims are based as of October 20, 2016.

The inadequate-warning claim is, or may be, situated differently than Taylor's other claims for purposes of applying the one-year prescriptive period under Louisiana law. As to failure to warn, Taylor's theory is that the warnings on the packaging, label, and insert of the Product were insufficient because the Product was far more dangerous than those materials specified. There appear to be genuine issues of material fact as to when Taylor knew, or should have known, of the purported divergence between the hazards identified in the packaging and the severity of the actual hazards posed by the Product. Merely having an adverse reaction to the Product would not necessarily furnish Taylor with notice of the insufficiency of the warnings or give her reason to know that those printed warnings understated or glossed over the true dangers of the Product, as she now claims. Accordingly, summary judgment is inappropriate on timeliness grounds as to that discrete aspect of Taylor's Complaint.

It also bears noting that the LPLA requires a plaintiff bringing a defective-design claim to prove that "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." La. Rev. Stat. § 9:2800.56(2). The summary judgment record is devoid of any evidence raising a reasonable inference that Taylor could satisfy the risk/utility element of such claim at trial.

In her opposition brief, Taylor hints that she may be pursuing a redhibition claim against defendants under Louisiana law. (Doc. 154, at 20-21.) This suggestion cannot rescue her Complaint from summary judgment for several reasons. First, the Complaint on its face does not state a claim for redhibition, and the time for amending the pleadings has long since expired, with no showing of good cause by Taylor for not amending her Complaint in a timely manner under the applicable Scheduling Order. Second, redhibition claims are also subject to a one-year prescription period, such that any redhibition claim asserted by Taylor herein would be time-barred. La. Civ. Code art. 2534(B) ("The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer."). Third, the elements of a redhibition claim under Louisiana law are that "the buyer must prove that a defect in the thing renders its use so inconvenient that he would not have bought it had he known of the defect; that the defect existed at the time of the sale, but was not apparent; and that the seller had the opportunity to repair the defect." Jackson v. European Service, Inc. , 246 So.3d 743, 749 (La.App. 2 2018). The "defect" in the Product was or should have been apparent to Taylor by virtue of the many warnings on the packaging about the risk of allergic reaction, including severe allergic reaction, and about the fact that the Product's ingredients may cause skin irritation. Moreover, there is no evidence that defendants were given an opportunity to repair the defect. For all these reasons, Taylor cannot overcome summary judgment by invoking the possibility of a claim for redhibition.

Plaintiffs' concession on this point appears dictated by the terms of the Alabama Deceptive Trade Practices Act. See Ala. Code § 8-19-15(a) ("The civil remedies provided herein and the civil remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment are mutually exclusive. An election to pursue the civil remedies prescribed in this chapter shall exclude and be a surrender of all other rights and remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of any act, occurrence or transaction actionable under this chapter.").

In their summary judgment briefs, Bowden and Bowens object that defendants' Motions failed "to assert any argument or offer any evidence regarding the substantive merits of [their] ADTPA claims," such that "Defendants Rule 56 petition is fatally defective and due to be denied." (Doc. 155, at 14; doc. 156, at 14.) But defendants' Motions for Summary Judgment contain considerable discussion of the evidence (or lack of evidence) that defendants engaged in misrepresentations, suppression of material facts, or deception. Those concepts - albeit labeled by defendants as grounds for dismissing non-ADTPA claims - are equally applicable to the Rule 56 analysis of the ADTPA claims; therefore, the Court will consider them here.

Another way to put it is like this: Bowden and Bowens have sued defendants under the ADTPA, claiming that the Product was far more dangerous than the warnings and instructions on the Product indicated. What actual knowledge did Bowden and Bowens have as of February/March 2016 that such was the case? They knew they had used the Product and they knew they had sustained adverse reactions. But did they know that the Product was more dangerous than defendants' warnings had led them to believe? The Court has no information before it that would allow a conclusive answer to that question on summary judgment; therefore, the timeliness issue is properly submitted to the jury.

In particular, Tackett sets forth as supporting information the following: (i) seven chemicals contained in the Product's ingredients list are known to produce toxic effects, such as severe skin burns, skin corrosion, blisters, and more; (ii) the ingredient p-phenylenediamine (or PPD) can accumulate in the skin, has a significant potential for causing hypersensitivity to the skin, and may impair renal function; (iii) the Product's label did not identify the specific injuries that the caustic chemicals in its ingredient list could cause, and said nothing of the risk of PPD accumulation in the skin; (iv) studies show that PPD's adverse effects are far more prevalent in African-Americans than in whites in the United States, yet defendants offered no such warnings; and (v) the skin allergy test described on the Product's packaging was basically a sham because skin on the scalp may react differently than skin on the elbow, self-testing may lead to misleading and false negative results, and the average consumer lacks the expertise to perform this test and analyze its results properly. (Doc. 155, Exh. B.) Plaintiffs' expert Ernest N. Charlesworth, M.D., offered opinions explaining why the self-test directed on the Product's packaging was deeply flawed and "deviate[d] from what a medical specialist in dermatology or allergy would advocate for patients with a potential for allergic contact dermatitis as a screen for hair dye allergy." (Doc. 155, Exh. C, at 3.) A fair reading of these expert opinions is that the skin test described in the Product's insert and packaging is misleading and deceptive because it is falsely portrayed as a reliable method for an unsophisticated consumer to test for allergic reaction to the Product.

In so concluding, the E.R. Squibb Court reasoned that proximate causation was necessarily lacking in a scenario where the plaintiff did not read the purportedly inadequate warning, to-wit: "Here, nothing in the nature of Squibb's inadequate warning prevented plaintiff from reading it. Plaintiff could have read this allegedly inadequate, unspecific warning as easily as he could have read an adequate, specific warning. And, no amount of specificity would have protected this plaintiff, because he would not have read a warning. Thus, the presumed inadequacy of Squibb's warning did not proximately cause plaintiff's injury." E.R. Squibb , 477 So.2d at 971.

In a separate section of their principal brief, defendants assert that summary judgment is appropriate for lack of causation because Bowens has not shown that the Product injured her. (Doc. 142, at 27-28.) Genuine issues of material fact preclude the relief defendants seek. After all, Bowens' evidence is that she experienced itching and burning on her scalp within 15 minutes after applying the Product. This evidence raises a reasonable inference that the Product caused Bowens' injuries.

On this last point, Franks' Complaint predicated federal jurisdiction solely on 28 U.S.C. § 1332(d), based on allegations that there were more than 100 class members, the aggregate amount in controversy exceeds $ 5,000,000, and at least one class member is a citizen of a state different from at least one defendant. (Doc. 44, at 8.) But Franks is no longer pursuing class claims, and her only individual claims still in play are creatures of state law, not federal law. Under the circumstances, it would appear that dismissal of Franks' action without prejudice for lack of jurisdiction is appropriate.